SOUTHWESTERN SHEET METAL
WORKS, INC., et al., Appellants
and Cross-Appellees,

v.

C. H. LEAVELL & COMPANY et al., Appel-
lees and Cross-Appellants,

Filtron Company, Inc., Appellee.

No. 5811.

Court of Civil Appeals of Texas.

El Paso.

April 5, 1967.

Rehearing Denied May 10, 1967.

Peticolas, Luscombe & Stephens, Wayne
Windle, Jr., El Paso, for appellants.

Collins, Langford, Pine & Woodard, El
Paso, for Filtron Co., Inc.

Kemp, Smith, White, Duncan & Ham-
mond, William J. Derrick, El Paso, for
Leavell & Co. and others.

OPINION

CLAYTON, Justice.

On March 21, 1963, C. H. Leavell & Com-
pany of El Paso, Texas, (herein known as

"Leavell") entered into a contract with the United States Government, through the Army Corps of Engineers, for the construction of certain radar facilities at White Sands Missile Range in New Mexico known as the "ZMAR" Facility or project. Leavell subcontracted the mechanical portion of the work to Brown-Olds Corporation (known herein as "Brown-Olds") including the furnishing and installation of wave guide filters, for radio wave shielding. Brown-Olds, in turn, subcontracted a portion of its work to Southwestern Sheet Metal Works, Inc. (known herein as "Southwestern") including the furnishing and installation of the wave guide filters. Southwestern executed a purchase order agreement with the Filtron Company, Inc. (known herein as "Filtron") for the manufacture and delivery of the filters within the prime contract completion schedule and according to plans and specifications for such filters included in the prime contract.

When the wave guide filters were received by Southwestern from Filtron and installed, several of the filters were alleged not to meet the attenuation requirements of the specifications and these filters were rejected by the Government. Southwestern informed Filtron of the rejection and a dispute arose as to the cause of the failure, with Filtron maintaining that these filters were damaged in the installation by Southwestern. In an attempt to correct the alleged deficient filters and prevent delay of the whole project, both Southwestern and Leavell made certain expenditures of time and money. Finally Filtron delivered supplemental filters, but the project was delayed from the original completion date of November 15, 1963 for installation and testing of the filters until on or about May 4, 1964. The entire project was to have been completed by December 22, 1963 with a provision that a penalty of $1,000.00 per day would be exacted by the Government for a delayed completion. However, this penalty was not withheld by the Government in its final payment to Leavell, and the latter makes no claim for such damages in this suit.

However, Leavell withheld from Southwestern the amount it had expended in attempting to correct the filters, and Southwestern withheld such amount as it had expended for such purpose from the purchase price owing to Filtron. Filtron then brought this suit against Southwestern and Leavell for recovery of the balance of the purchase price, and Southwestern and Leavell filed counter-claims for their damages for the failure of the filters to meet specifications. Leavell also filed against Brown-Olds, which became a third-party defendant, and which filed a cross-action against Southwestern and Filtron.

In the trial a total of thirteen special issues were submitted to the jury, which special issues will not be dwelt upon individually except as necessary under the various points of error. The trial court entered judgment in the following terms: The defendants Leavell and Southwestern, and cross-defendant Brown-Olds having stipulated that should cross-defendant Brown-Olds be found to have breached its contract with Leavell, then Southwestern would be deemed to have breached its contract with Brown-Olds in the same particulars and to the same extent; and the court having granted plaintiff Filtron's motion for directed verdict on defendant Leavell's counter-claim against Filtron at the close of all evidence, and also having granted at such time Leavell's motion for directed verdict against Filtron on its suit against Leavell, and based on the jury's findings, the court entered judgment in favor of Filtron in the amount of $8,488.61 against Southwestern; in favor of Leavell against Brown-Olds on the former's cross-action in the amount of $2,574.25 plus $1.00 as nominal damages plus attorney's fees in the amount of $1,250.00; in favor of Brown-Olds against Southwestern on the former's cross-action in the amount of $3,825.25; and since Leavell had withheld from Brown-Olds the sum of $2,574.25, and Brown-Olds in turn

withheld the same sum from Southwestern, the last-named was given credit for said .amount as against Leavell and Brown-Olds, so that the judgment in favor of Brown-Olds against Southwestern was reduced by $2,574.25. Filtron took nothing against Leavell, and Leavell took nothing on its counter-claim against Filtron. Leavell took nothing on its cross-action against Southwestern, and Southwestern took nothing on its cross-action against Leavell and Brown-Olds. Southwestern's motion to disregard certain jury findings and for judgment N.O.V., and for new trial, were overruled, as were all motions for judgment on the verdict, from which this appeal is taken by Southwestern, Brown-Olds and Leavell.

■ The First Point of Error by appellant Southwestern complained of the trial court's overruling Southwestern's motion for new trial because the evidence presented at the hearing on such motion proved that harmful jury misconduct occurred as a matter of law. The alleged misconduct occurred principally in the jury's answers to Special Issues 3, 4, and 11. Special Issue 3 inquired as to whether Filtron fabricated and delivered to Southwestern all the filters (not including supplementary filters) in accordance with the plans and specifications. The jury answered "No". Issue 4 inquired what sum of money was reasonably expended by Southwestern in connection with the failure of Filtron to furnish filters meeting the plans specifications, if the jury found they did so fail, to which the jury answered $.00 (zero). Special Issue 11 inquired whether Southwestern orally agreed with Filtron that if Filtron would furnish supplementary filters, Southwestern would pay Filtron the sum of $8,580.32 and would install these filters at no expense to Filtron and waive any claim to damages because of the failure of some of the original filters to pass the frequency range test. The jury answered "yes" to this issue. There were attached to the motion for new trial the affidavits of six jurors, and four jurors were called by Southwestern and

testified at the hearing on the motion, as well as two jurors called by Filtron. It seems advisable to quote parts of the jurors' testimony here. One, Alice L. Gereche, testified in part as follows:

"Q Was there any discussion during that time about the possibility of a hung jury or not?

A Yes, sir, there was. On the third question, there was a discussion. One of the jurors said that if we didn't agree with him that he was going to hang the jury.

Q Okay. Do you remember whether or not most of the questions were answered before the last day or on the last day?

A Most of them were on the last day.

Q Were on the last day? I hand you a copy of the questions that you had in the juryroom and ask you if you can remember whether or not Questions No. 3, 4, and 11 were answered on the last day or before the last day.

A They were answered the last day, right together."

*    *    *    *    *    *

"A Well, I do remember that we discussed it thoroughly, and it seems to me that we did discuss it in two parts. We wanted Filtron to be paid what Southwest owed them. We also—we didn't want Southwest to waive all their expenses."

*    *    *    *    *    *

"Q In talking about the damages question, do you remember any of the discussion about Southwestern's damages?

A I just remember that—that Mr. Haverly [foreman of the jury] assured us that we didn't have anything to worry about, that Southwest was bonded or insured, that most companies are. In his experiences, he found it so, so we just agreed

more or less simultaneously, we all just agreed that no one was going to be hurt; we didn't want anyone hurt."

\* \* \* \* \* \*

"Q What did you say?

A I said, 'Well, let's get the show on the road. If they're bonded, well, we're all right. Let's answer this thing "yes", and let's don't have a hung jury.'

Q After that, did you, in fact, answer it 'yes'?

A· Yes."

\* \* \* \* \* \*

"A Well, Mr. McVicker said that he definitely was not going to answer No. 3 'yes', and that if we would go along with it and answer No. 4 'no' and No. 11 'yes', that—

Q Did he discuss these three questions together or—

A We went on ahead; we skipped questions and tried to come to some agreement on these questions, but really and truly the thing I remem-. ber the most about it was just the fact that we wanted Filtron to be paid their $8,580.32, and we didn't want Southwest to be stuck with all the expenses, and we were just trying to come to a decent agreement."

\* \* \* \* \* \*

"Q Let me ask you if you recall any discussion about the answers and what would happen if they were answered a certain way.

A Well, we just decided that if they were answered like this, as I have repeated, no one was going to be hurt by it. If Southwest was protected, well, that's what we wanted; that's · what we were after.

Q Okay. Did several jurors enter into this discussion concerning the bonding company?

A Yes. ·

Q Approximately how many?

A Several did.

Q I beg your pardon?

A Oh, approximately three.

Q Do you recall what the foreman said as far as his experiences are concerned?

A Well, he said that he had *had* worked with filters of this type or similar, and what else did he say—he said that he was quite sure that they—that Southwest would be bonded and protected, and Mr. Juen for one and myself for the other spoke up and said, 'Well, if it's a case where—', and everybody was in agreement; it was just more or less an agreement."

Another ·juror, Richard Juen, testified:

"Q Do you remember who stated this?

A Well, as to my—I recall the foreman [Mr. Robert W. Haverly] was the one that brought up the bonding company issue. He said he was familiar with this type of contract or one similar to it as well as familiar with the bonding companies, and he felt sure that there was a bonding company involved."

\* \* \* \* \* \*

"Q What was said in this connection in the juryroom after this bonding company was brought up, what did they say about it?

A Well, they said that since this—by answering No. 3 'no', and this No. 11 'yes', the bonding company would stand any damages; therefore, nobody would be hurt, neither Filtron nor Southwestern."

\*   \*   \*   \*   \*   \*

"A  After the bonding company issue was brought out, it was brought up by one juror that if we would go ahead and answer the question to No. 3 'no'; answer Question No. 11 'yes', then as far as they were concerned, it was a 'yes' answer from there on \* \* \*."

\*   \*   \*   \*   \*   \*

"A  We answered Question No. 4 when we answered Question No. 3 and 11.

Q  Which ones did you answer first; do you recall?

A  Well, I recall a discussion about a— on Question No. 3 earlier—early the first day that under no circumstances this one juror would change his mind, and it would be a hung jury as far as he was concerned, and we didn't get anywhere on No. 3 and No. 4 as well. We went all the way to No. 11, and before Question No. 4 was answered. I would say we answered No. 3 first."

\*   \*   \*   \*   \*   \*

Also a juror, Roland Kelly testified:

"Q  What was said?

A  It was mentioned that by—it was mentioned that there could be a— that they might be covered by a bond.

Q  Approximately how many jurors mentioned this?

A  Three or four.

Q  Was this discussion before or after you answered Question No. 11?

A  Discussion was before.

Q  What happened after you answered it—I mean—excuse me—what happened after this discussion?

A  It more or less brought it to a head; we came to agreement sooner."

\*   \*   \*   \*   \*   \*

"Q  After this discussion, how much longer did the jurors continue to deliberate?

A  Well, very short time after that."

\*   \*   \*   \*   \*   \*

"Q  Do you remember when you first began discussing Question No. 11, do you remember whether a majority of people were for a 'no' vote or a 'yes' vote on Question No. 11.

A  The majority was for a 'no' to begin with."

One William R. Naismith, juror, testified:

"Q  What did you ask?

A  Who would pay for these damages and whether Filtron or if Filtron was paid, who would pay it.

Q  And what was the answer?

A  That a bonding company is set up for such things.

Q  Who told you this?

A  The foreman.

Q  Exactly what did he relate to you as best you recall?

A  As I recall, he said that this was the performance of a bonding company."

\*   \*   \*   \*   \*   \*

"A  It was discussed that since Filtron would get their money and Southwest would not be hurt too bad—in other words, both sides be pretty well settled, we would answer it with a 'yes'.

Q  After this discussion, how did you answer it?

A  'Yes'."

\*   \*   \*   \*   \*   \*

"Q  Do you recall whether or not any other questions were discussed in connection with Question No. 11?

A  Yeah, we figured by answering this one 'yes', and I think the third and

the fourth as they were answered would more or less equalize everybody concerned.

Q Was this stated in the juryroom?

A It was.

Q Do you remember who stated it?

A No. One of the jurors that was there."

On the other hand, another juror, J. E. Molder, Filtron's witness, testified:

"Q And I'll ask you whether or not from time to time, as the discussion insued, the foreman would instruct the jury that they were getting out of the record and to consider only matters that were in evidence.

A He did.

Q On how many occasions in your—

A Well, I couldn't say for sure.

Q Well, as many as five, ten—

A Well, I would imagine it would be as many as five anyway."

\* \* \* \* \* \*

"Q After the foreman had so warned the jury, what, if anything, did the jury do then?

A Well, he tried to get them back on the business at hand.

Q Do you recall anyone in the juryroom saying anything about some bonds and that it didn't make any difference how the questions were answered that a bonding company would pay anyway; did you ever hear that, sir?

A I don't remember if I did."

\* \* \* \* \* \*

"Q Mr. Molder, would you say that there—you wouldn't deny under oath that that was mentioned, would you?

A Well, I would have to say that I didn't hear it if it was mentioned or I don't remember hearing it; let's put it that way.

Q You just don't remember hearing it?

A I don't remember hearing it."

And Mr. Haverly, foreman of the jury, another Filtron witness, testified as follows:

"Q All right, sir. Now, do you recall anyone saying anything about a bonding company paying?

A No, sir.

Q Did you ever say anything like that?

A No, sir, not to my recollection, and I think I would know it if I did.

Q Did you ever hear anything like that?

A No, sir—I heard it there after the case was over."

\* \* \* \* \* \*

"Q Was there any discussion that in order to reach the end that you were seeking that No. 3 should be answered 'no', No. 4 'zero', No. 11 'yes'?

A This was the crux of the whole matter."

\* \* \* \* \* \*

"Q It became easier to answer them after this one juror explained how they should be answered?

A He didn't explain the rest of them, just these two was the way—the way—the main thing was on No. 3.

Q And he explained how they should be answered?

A He explained how they could be answered.

Q To achieve this particular end?

A Right.

Q And then after he explained that, why, they were answered that way?

A Uh-huh."

\* \* \* \* \* \*

"Q In other words, is what you're saying is a fair statement, a summary of what you've been saying that one juror—"

\* \* \* \* \* \*

"A He stated that he had a solution, and he read it, and he explained—I don't recall just exactly how, but he explained it where if we answered a question 'no', and the other question 'zero' that it would solve the problem, that the people wanted to see Filtron receive their money \* \* \*."

On the matter of jury misconduct, Southwestern cites us to Travelers Insurance Company v. Carter, 298 S.W.2d 231 (Tex.Civ.App., 1957; ref., n. r. e.), which was a Workmen's Compensation case in which the issue of whether the injured employee had suffered incapacity which was permanent or only temporary was hotly contested. It was contended by appellant that there was jury misconduct requiring a reversal of the judgment rendered in favor of Carter. On motion for new trial by the insurance company, four jurors were called as witnesses at the hearing, one of whom, a Mrs. Duckett, testified that during deliberations another juror had related his personal experiences under similar conditions, and there was some discussion about this by the jury, although the jury had been warned by another juror that this was improper. The other three jurors appearing at the hearing, including the foreman, did not deny that such a discussion had taken place, but merely testified that they hadn't heard it or didn't remember having heard it, which, it will be seen, is very much like our case here. The court in the Carter case held:

"\* \* \* It is well settled that where there is a conflict in the evidence on whether or not misconduct occurred the question for determination is one of fact and the decision of the trial court is final. Barrington v. Duncan, 140 Tex. 510, 169 S.W.2d 462. We cannot agree however, that the evidence at the hearing of the motion for a new trial presents a question of fact. Mrs. Duckett's positive and uncontroverted testimony shows in effect that one of the jurors related his own personal experience in obtaining employment while he was suffering from incapacity by reason of a hernia and expressed the opinion that appellee would have to sign a waiver of any partial incapacity he had in order to obtain employment."

\* \* \* \* \* \*

"The testimony of neither of the other three jurors can be construed as a denial of Mrs. Duckett's statement and account of the jury misconduct. The effect of the testimony of two of the jurors was that they didn't hear it or didn't remember hearing it. Neither by positive statement nor by implication do they indicate that they were at all times during the jury deliberations in position to have heard the matters related by Mrs. Duckett if they had occurred and that it would have been impossible or at least improbable for such misconduct to have occurred without being heard by them. \* \* \*"

\* \* \* \* \* \*

"\* \* \* Mrs. Duckett's testimony concerning the jury misconduct therefore stands unchallenged. There is no conflicting testimony upon which to base a finding of fact contrary to her version of the matter.

"The remaining question is whether the undisputed misconduct of the jury shown by Mrs. Duckett's testimony was such that it was calculated to and probably did prejudice the rights of the appellant. Rule 327, supra. In our

opinion this question must be answered in the affirmative. * * * In this state of the evidence we cannot say that no probable injury resulted to appellant by reason of the unsworn testimony of the unidentified juror to the effect that he couldn't get a job without signing a waiver of his partial disability and that Carter would probably have to do the same if a jury found that he was only disabled to the extent of 15 per cent. Although warned of the impropriety of such misconduct the discussion continued. We are of the opinion, after a consideration of the entire record, that there was probable injury to appellant from the misconduct shown by the undisputed evidence. White Cabs v. Moore, 146 Tex. 101, 203 S.W.2d 200.

"The judgment of the trial court is reversed and the cause is remanded for another trial."

Furthermore, there was the matter of the jury discussing what end they desired to achieve, and the manner in which this could be accomplished. We are cited to Crawford v. Consolidated Underwriters, 323 S.W.2d 657 (Tex.Civ.App., 1959; ref., n. r. e.) where it is held:

"* * * But the jury's conduct in first agreeing upon the amount of money they wanted the plaintiff to receive and in then deliberately endeavoring to answer the special issues in a manner that would entitle the plaintiff to judgment for that amount cannot be so lightly brushed aside. That it amounted to misconduct is believed to be established by the uniform decisions of our courts." (Citing cases.)

We are also cited to Prudential Fire Ins. Co. v. United Gas Corporation, 145 Tex. 257, 199 S.W.2d 767 (1946) which holds:

"The trial court found that two of the jurors agreed before they voted on any of the special issues that a verdict should be rendered for the gas company and, pursuant thereto, answered each issue so that the verdict they rendered would not permit the insurance company to recover. The court's conclusion of law on the facts found was that this conduct would not 'authorize' him to grant a new trial. This was error in that the action of the two jurors constituted misconduct. Having held that the misconduct occurred it became the court's province to determine under all the facts whether injury probably resulted to the insurance company. Texas Rules of Civil Procedure, rule 327; Barrington v. Duncan, 140 Tex. 510, 169 S.W.2d 462. The fact is inescapable in view of the entire record, that this was reversible error. When misconduct is established both the trial court and the reviewing courts have the right to review the matter in the light of the entire record. Id."

In the light of the entire record we conclude that the misconduct of the jury above set out resulted in injury to the appellant Southwestern herein.

■ If anything, the case before us is a stronger case for reversal than the above cited cases. We feel impelled, therefore, to sustain the first point of error. We should add that Filtron's brief countered with the statement that Southwestern itself had offered into evidence two exhibits which, from examination, reveal reference to bonds and sureties which led the jury to their conjecture, and having so introduced these exhibits, Southwestern could not here claim misconduct of the jury "because it inferred, *if it did,* from such exhibits, that bonds were required as between the various parties." (Emphasis supplied). These exhibits were the contract of Brown-Olds and Southwestern, and between Leavell and Brown-Olds. Upon examination, we find in the first contract the words, "It is understood this subcontract includes all insurance necessary for the completion of this subcontract"; and in the second, the words "The following items are not considered a part of this subcontract * * * 2. Bonds."; and, in

Section 27: "The subcontractor shall furnish all guaranties, bonds, * * * and shall, if requested by the Contractor, furnish to the Contractor adequate performance and payment bonds * * * acceptable to the Contractor." These exhibits were admitted in a limited form, not as against Filtron, and there is no showing that they were carefully examined, if examined at all, by the jury. Certainly no evidence was presented that any juror referred to these provisions and no juror was asked by Filtron's attorneys at the new trial hearing if he or she had examined these exhibits. It would be the purest surmise on our part to hold that these provisions had actually influenced the jury in any way. The first point of error is sustained and this cause remanded for new trial.

 In the event of possible retrial, we believe that none of the other points of error need be considered here, with the possible exception of the sixth point, but such other points of error, if raised on a new trial, should be re-examined by the trial court in the light of testimony there adduced. The sixth point of error complains of the refusal of the court to submit requested Special Issues Nos. 1 and 2, and requested instruction No. 1. These requested special issues and the requested instruction were requests of both Leavell and Southwestern. Requested Special Issue No. 1 would have inquired of the jury as to whether, at the time Filtron made its warranties to Southwestern (as to compliance of the filters with the plans and specifications), a reasonably foreseeable result of a breach of such warranties would be a claim against Southwestern for breach of contract in its work on the ZMAR project. Requested Issue No. 2 would have inquired whether the failure of the filters to meet these plans and specifications, if so found by the jury, resulted in the claim against Southwestern for such breach of contract. The requested instruction correctly defined "reasonably foreseeable result". We feel that these

requests should have been granted under the evidence presented here, but of course in the event of a new trial, the trial court will be governed by the evidence presented there.

This also is true of the sole point presented by Leavell and Brown-Olds upon appeal, that the trial court erred in effect, in granting Southwestern's motion for judgment N. O. V. by refusing to render judgment for Leavell against Brown-Olds and Brown-Olds against Southwestern in the amount of $16,361.62 (the amount prayed for including $1,250.00 as attorney's fees).

With these observations and our ruling as to Southwestern's first point of error, this cause is reversed and remanded.